In re Tommie L. SELF, Debtor.

Structured Asset Services, L.L.C. f/k/a Stone Street Services, Inc., Plaintiff,

v.

Tommie L. Self, Defendant.

Bankruptcy No. 02 B 19018.
Adversary No. 02 A 01193.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

May 23, 2005.

Juliet Boyd, Esq., for Plaintiff.

Ross Weisman, Esq., for Debtor/Defendant.

Gus A. Paloian, Esq., trustee.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the amended complaint filed by Structured Asset Services, L.L.C. f/k/a Stone Street Services, Inc. (the "Creditor") objecting to the discharge of Tommie L. Self (the "Debtor") pursuant to 11 U.S.C. § 727(a)[1] and requesting a judgment in its favor in the sum of $145,776.01. For the reasons set forth herein, the Court grants judgment in favor of the Creditor and sustains the objections to discharge under § 727(a)(2)(A), (a)(3), (a)(4) and (a)(5). The Debtor's discharge is denied. The Court declines to liquidate the Creditor's debt and enter a money judgment in its favor.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334

---

1. The Creditor failed to specify in the amended complaint the particular subsections under which it seeks to bar the Debtor's discharge pursuant to § 727(a). Nevertheless, based on the allegations in the amended complaint, the pretrial submissions, the evidence adduced at the trial, and the arguments of counsel, it appears that the Creditor seeks to bar the Debtor's discharge under § 727(a)(2)(A), (a)(3), (a)(4), and (a)(5).

and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (J), and (O).

## II. *FACTS AND BACKGROUND*

Many of the facts in this matter are undisputed. On December 22, 1990, the Debtor won $1,000,000.00 from the Illinois State Lottery. *See* Debtor Ex. No. 2. He was to receive twenty annual payments of $50,000.00 commencing in 1991. *Id.* The Debtor testified that he was employed by the Chicago Transit Authority as a bus maintenance worker for approximately thirty-three years and recently retired. He has a high school diploma, but no other higher education.

On September 30, 1997, the Debtor borrowed money from Stone Street Capital, Inc. ("Stone Street"). *See* Creditor Ex. No. 2. The Debtor executed, among other documents, a loan agreement, secured installment note, security agreement, and escrow agreement with Stone Street whereby the Debtor borrowed the sum of $103,198.02. *Id.* The loan had accruing annual interest of approximately twenty-three percent per year and was for a ten year period. *Id.* The first installment of $25,000.00 was due on February 22, 1998, and then $25,000.00 was due every February 22nd thereafter until 2008. *Id.* The Debtor's remaining lottery prize, including the annual payments of $50,000.00, was the agreed upon security and collateral for the loan. *Id.* Pursuant to the security agreement, the Debtor agreed not to sell, encumber, transfer or dispose of the collateral in any way. *Id.* In addition, pursuant to the escrow agreement, as well as a letter sent to the Illinois State Lottery, the $50,000.00 annual payment was to be sent directly by the Illinois State Lottery to Republic National Bank of New York as

escrow agent for Stone Street. *Id.* The Debtor also executed a confession of judgment in which the Debtor agreed to the entry of judgment against himself in the event of a default of the loan. *Id.* Stone Street paid and the Debtor received the loan amount of $103,198.02. The loan was subsequently assigned from Stone Street to the Creditor.

In early 2000, the Debtor contacted the Illinois State Lottery and requested that the annual check be sent to his home address in Olympia Fields, Illinois (the "Olympia Field Property"), instead of to Republic National Bank of New York, in derogation of the loan documents. The Debtor's request was confirmed by a letter from the Illinois State Lottery on April 6, 2000. *See* Debtor Ex. No. 4; Creditor Ex. No. 3, at p. 3.

On April 3, 2000, the Illinois State Lottery sent a letter offering the Debtor the option to liquidate his lottery prize. *See* Debtor Ex. No. 3; Creditor Ex. No. 3. The Debtor was given the option to take the remainder of the prize money in one lump sum in a vastly reduced amount. *Id.* On April 10, 2000, the Illinois State Lottery liquidated the Debtor's discounted lottery prize, and after payment of federal and state taxes, the Debtor's net proceeds were $252,095.90. *See* Debtor Ex. No. 5; Creditor Ex. No. 3, at p. 4. On April 27, 2000, the Debtor received the sum of $252,095.90, which was deposited into his checking account at Pullman Bank, Chicago, Illinois. *See* Debtor Ex. No. 8, at p. 2. The Debtor did not contact Stone Street or its assignee, the Creditor, to inform them that he had received the discounted remainder of the lottery prize in a lump sum.

On May 6, 2000, the Debtor purchased a Cadillac automobile from Shirley Cadillac in the amount of $46,301.94. *See* Creditor Ex. No. 4ii. The Debtor had the use and benefit of the automobile from 2000 until

the present. The Debtor allegedly purchased the vehicle in the name of his spouse, Mrs. Tommie L. Self ("Mrs.Self"),[2] but failed to produce any records to corroborate her ownership of the Cadillac. Shortly thereafter, on June 10, 2000, the Debtor purchased a Hyundai automobile in sum of $6,331.97. *See* Creditor Ex. No. 4iv. The Hyundai was purchased in the name of the Debtor, and he has enjoyed the use and benefit of the automobile from 2000 until the present.

On May 9, 2000, a check in the amount of $26,803.70 was made payable to Tommie L. Self from the account at Pullman Bank. *See* Creditor Ex. No. 4iii. The Debtor testified that Mrs. Self wrote this check payable to herself in order to purchase a cashier's check. According to the Debtor, the mortgage on the Olympia Fields Property was in arrears, and Mrs. Self was going to pay the mortgage holder, Ameriquest, that sum. However, the Debtor did not produce any written documentation to show that Ameriquest was in fact paid that amount.

On January 16, 2001, the Debtor transferred $90,000.00 out of the checking account at Pullman Bank by way of a check made payable to Mrs. Self. *See* Creditor Ex. 4i. Mrs. Self admittedly held the $90,000.00 for the use and benefit of the Debtor. Mrs. Self testified that she used this money to make the mortgage payments on the Olympia Fields Property, pay college tuition for her children, and pay other household expenses.

The Debtor did not make the February 2001 payment to the Creditor pursuant to the loan documents. Andrew Savysky ("Savysky"), the president of the Creditor, testified that he contacted the Debtor in March 2001 about the default under the loan. After several conversations with the

Debtor, Savysky stated that in late March 2001, the Creditor received a personal check from the Debtor in the amount of $25,000.00. Savysky testified that at this point in time he did not know that the Debtor had taken a discounted lump sum from the Illinois State Lottery. On December 13, 2001, the Creditor filed a two-count complaint against the Debtor in the Circuit Court of Cook County, Illinois, alleging breach of contract and unjust enrichment. *See* Debtor Ex. No. 6. The Creditor did not receive the February 2002 payment or any subsequent payment from the Debtor due under the loan documents.

The Debtor filed a voluntary Chapter 7 petition on May 15, 2002. *See* Debtor Ex. No. 1; Creditor Ex. No. 1. On his Schedule A—Real Property, the Debtor listed the Olympia Fields Property. *Id.* He listed no other real property on the Schedule A. *Id.* On Schedule B—Personal Property, the Debtor listed a 1996 Honda Accent automobile. *Id.* He listed no other vehicles. *Id.* On May 15, 2002, however, the Debtor had an interest in real property located at 659 East 105th Street, Chicago, Illinois (the "Chicago Property"), *see* Creditor Ex. No. 5, and in the Hyundai automobile he purchased on June 10, 2000. The Debtor failed to list the Chicago Property or the Cadillac and Hyundai on his Schedules A and B, respectively. *See* Debtor Ex. No. 1; Creditor Ex. No. 1.

The Debtor testified that he never owned a Honda automobile. Rather, he stated that the Schedule B should have reflected a 1996 Hyundai Accent. However, the Debtor never amended his Schedules to change the reference therein from the Honda to the Hyundai. As for the Chicago Property, the Debtor testified that he did not think he owned it because a

---

**2.** Both the Debtor and his spouse use the same names, Tommie L. Self.

judicial deed of sale had been entered. *See* Creditor Ex. No. 6.

Further, on the Schedule D—Creditors Holding Secured Claims, the Debtor listed Illinois Title Loan as having a lien on the 1996 Honda Accent vehicle. *Id.* In addition, on the Statement of Intention, the Debtor indicated that he intended to reaffirm the debt on the 1996 Honda Accent automobile. *Id.* On the Schedule F—Creditors Holding Unsecured Nonpriority Claims, the Debtor listed Stone Street as a claimant in the amount of $168,058.31. *Id.*

On his Statement of Financial Affairs, the Debtor stated that he received no income other than from his employment or operation of business during the two years preceding the commencement of the bankruptcy case. *Id.* Moreover, the Debtor stated that he made no gifts or charitable contributions within one year prior to the case filing, except ordinary and usual gifts to family members aggregating less than $200.00 in value per individual. *Id.*

Pursuant to 11 U.S.C. § 341, a meeting of creditors was held and the Debtor testified at that meeting. *See* Creditor Ex. No. 9. The Debtor did not disclose the transfer of the $90,000.00 to Mrs. Self, nor did he disclose the existence of the Cadillac and Hyundai automobiles. In fact, he testified at the § 341 meeting that he did not use any of the proceeds from the lottery prize to purchase any automobiles. *Id.* at p. 26.

On August 26, 2002, the Creditor filed the instant adversary proceeding. The Creditor filed an amended complaint on March 17, 2005, which seeks the denial of the Debtor's discharge as well as a judgment in the sum of $145,776.01 as a result of the Debtor's default under the loan documents. On December 10, 2002, the Creditor served interrogatories on the Debtor pursuant to Federal Rule of Bankruptcy Procedure 7033, which incorporates by reference Federal Rule of Civil Procedure 33. The Debtor answered those interrogatories on July 27, 2004. *See* Creditor Ex No. 15.

The Court held an evidentiary hearing in this matter where the Creditor made a motion for directed findings under Federal Rule of Bankruptcy Procedure 7052, which incorporates by reference Federal Rule of Civil Procedure 52(c). The Court reserved ruling on the motion until the close of all of the evidence.

### III. *STANDARDS FOR OBJECTIONS TO DISCHARGE*

The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir.2002). In exchange for that fresh start, the Bankruptcy Code requires debtors to accurately and truthfully present themselves before the court. *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr.N.D.Ill.2002), *aff'd*, No. 02 C 9451, 2003 WL 403138 (N.D.Ill. Feb.20, 2003). Indeed, a discharge is only for the honest debtor. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *McWilliams*, 284 F.3d at 790; *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996); *In re Garman*, 643 F.2d 1252, 1257 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). "The denial of discharge is a harsh result." *Henbest v. Meyer (In re Meyer)*, 307 B.R. 87, 91 (Bankr.N.D.Ill.2004). Because the denial of a discharge is so drastic a remedy, courts may be more reluctant to impose it than to find a particular debt non-dischargeable. *See Soft Sheen Prods., Inc. v. Johnson (In re Johnson)*, 98 B.R. 359, 367 (Bankr.N.D.Ill.1988) ("The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor.").

██ The party objecting to a debtor's discharge has the burden of proving the objection. Fed. R. Bankr.P. 4005; *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983) (noting that "the *ultimate* burden of proof in a proceeding objecting to a discharge lies with the plaintiff"). Objections to discharge under 11 U.S.C. § 727 should be liberally construed in favor of debtors and strictly against objectors in order to grant debtors a fresh start. *Juzwiak*, 89 F.3d at 427. The objector must establish all required elements of the objection by a preponderance of the evidence. *In re Scott*, 172 F.3d 959, 966–67 (7th Cir.1999).

## IV. *DISCUSSION*

### A. 11 U.S.C. § 727(a)(2)(A)

██ Section 727(a) of the Bankruptcy Code denies a discharge to debtors who have been unscrupulous in different ways. *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 740 (Bankr.N.D.Ill.2004). The Creditor argues that the Debtor is not entitled to a discharge under § 727(a) for numerous reasons. The Court will address each one in turn.

First, the Creditor contends that the Debtor, with the intent to hinder, delay, or defraud his creditors, transferred, removed, and concealed property. Section 727(a)(2)(A) strictly prohibits such conduct and provides that:

(a) The court shall grant the debtor a discharge unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A) (2005).

██ Under § 727(a)(2)(A), an objection to discharge will be sustained if the objecting party alleges and proves the following elements: (1) the debtor transferred, removed, destroyed, mutilated, or concealed property; (2) belonging to the estate; (3) within one year of filing the petition; and (4) with the intent to hinder, delay or defraud a creditor of the estate. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir.2002), *aff'd*, 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004); *Saluja v. Mantra (In re Mantra)*, 314 B.R. 723, 729 (Bankr. N.D.Ill.2004); *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 894 (Bankr.N.D.Ill.2003). An exception to discharge pursuant to § 727(a)(2)(A) " 'essentially consists of two components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor).' " *Kontrick*, 295 F.3d at 736 (*quoting Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir.1993)); *see also Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R. 211, 226–27 (Bankr. N.D.Ill.2003), *aff'd*, No. 03 C 8023, 2004 WL 2075442 (N.D.Ill. Aug.31, 2004). Both elements must have been present during the year before bankruptcy; anything occurring earlier is "forgiven." *Kontrick*, 295 F.3d at 736.

██ A concealment for purposes of § 727(a)(2) consists of "failing or refusing to divulge information to which creditors were entitled." *Holstein*, 299 B.R. at 229 (internal quotation omitted); *see also Scott*, 172 F.3d at 967 (stating that concealment includes "preventing discovery" or "fraudulently transferring or withholding knowledge or information required by law to be made known"). A concealment will

238

be found when a debtor purports to transfer an asset, making it appear as if he no longer owns it, but he in fact retains an interest in the asset. *McWilliams*, 284 F.3d at 794; *Holstein*, 299 B.R. at 229.

■■■■ Indeed, § 727(a)(2)(A) prescribes a one-year limitations period. However, under the doctrine of continuing concealment, "where property is transferred more than one year before bankruptcy, a discharge may nonetheless be denied if the concealment of any retained interest in that property continues into the statutory one-year period, coupled with the requisite intent." *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 272 B.R. 463, 474 (Bankr.N.D.Ill.2001); *see also Holstein*, 299 B.R. at 231; *Costello*, 299 B.R. at 895. " '[A]s long as the debtor allow[s] the property to remain concealed into the critical year,' the continuing concealment doctrine will apply." *Holstein*, 272 B.R. at 474 *(quoting Rosen*, 996 F.2d at 1531). "The doctrine recognizes that the failure to reveal property previously concealed can be considered culpable conduct during the year before bankruptcy warranting a denial of discharge." *Holstein*, 299 B.R. at 231 (internal quotation and footnote omitted). Even if a debtor transfers legal title to the property, his continued use of the property is sufficient to constitute a continuing concealment. *Holstein*, 299 B.R. at 229; *Costello*, 299 B.R. at 895. If a creditor can establish that the debtor retained either control or an equitable interest in the property, courts have denied discharge under the doctrine of continuing concealment. *Costello*, 299 B.R. at 895.

■■■ The Court finds that the Debtor transferred, removed, and concealed property that belonged to him. First, the Debtor transferred $90,000.00 to Mrs. Self on January 16, 2001. The Debtor testified that Mrs. Self deposited the funds into an account at Charter One Bank. The Debtor stated that he was a signatory on that account at one point in time, but was later removed from the account. However, the Debtor failed to produce any documentation to show that he was no longer named on the account. Indeed, the Court finds that those funds were held by Mrs. Self for the benefit and use of the Debtor. Mrs. Self testified that she used the funds to pay joint household expenses, including the mortgage payments on the Olympia Fields Property. Further, the Debtor failed to disclose the $90,000.00 transfer in answer to interrogatory number five, which asked him to identify every payment or disbursement to any person in the amount of $1,000.00 or more between April 2000 to the present. *See* Creditor Ex. No. 15, at p. 4. Moreover, the Debtor failed to make disclosure of this transfer at the § 341 meeting of creditors or at his deposition taken in this matter on July 2, 2003. *See* Creditor Ex. Nos. 8 & 9.

Second, on May 6, 2000, the Debtor purchased a Cadillac automobile in the sum of $46,301.94. According to the Debtor and Mrs. Self, the Debtor purchased the vehicle for Mrs. Self as a gift. The Debtor failed to produce the title to the automobile to substantiate her ownership of the vehicle. Moreover, the Debtor testified that he had the continued use and benefit of the automobile.

Third, on May 9, 2000, a check in the amount of $26,803.70 was made payable to Mrs. Self from the joint checking account at Pullman Bank. *See* Creditor Ex. No. 4iii. According to the Debtor, Mrs. Self wrote the check to herself so that she could purchase a cashier's check payable to Ameriquest, the mortgage holder on the Olympia Fields Property. However, the Debtor failed to produce any documentation to corroborate that the money was actually paid to Ameriquest.

In sum, based upon the above, the Court finds that the Debtor transferred, removed, and concealed property that belonged to him.

■■■ Next, the Court must determine whether the Debtor had the requisite fraudulent intent under § 727(a)(2)(A). The issue of a debtor's intent is a question of fact to be determined by the bankruptcy judge. *In re Smiley,* 864 F.2d 562, 566 (7th Cir.1989). Denial of discharge under this section requires proof of actual intent to hinder, delay, or defraud a creditor. *McWilliams,* 284 F.3d at 790; *In re Snyder,* 152 F.3d 596, 601 (7th Cir.1998); *In re Krehl,* 86 F.3d 737, 743 (7th Cir.1996); *Smiley,* 864 F.2d at 566. Because debtors rarely admit their intent was fraudulent, actual intent to hinder, delay or defraud may be proven by circumstantial evidence or by inference drawn from a debtor's course of conduct. *McWilliams,* 284 F.3d at 791; *Snyder,* 152 F.3d at 601; *Krehl,* 86 F.3d at 743; *Smiley,* 864 F.2d at 566. Courts are reluctant to accept a debtor's self-serving statement of his intent as the best evidence of that intent. *Costello,* 299 B.R. at 895.

■■■ "In determining whether a debtor has acted with intent to defraud under § 727, the court should consider the debtor's 'whole pattern of conduct.'" *Bennett & Kahnweiler Assocs. v. Ratner (In re Ratner),* 132 B.R. 728, 731 (N.D.Ill. 1991) (quoting *First Tex. Savs. Assoc., Inc. v. Reed (In re Reed),* 700 F.2d 986, 991 (5th Cir.1983)); *see also Costello,* 299 B.R. at 895 (noting that courts can deduce fraudulent intent by examining the totality of facts and circumstances surrounding the transaction). The Seventh Circuit has adopted several factors which, if shown, indicate actual fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property at issue; (4) the financial condition of the debtor; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the chronology of the events and transactions under inquiry. *McWilliams,* 284 F.3d at 791. "[T]he retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer." *Costello,* 299 B.R. at 895–96 (quotation omitted). The fact that property is transferred by the debtor to a relative is relevant. *Id.* at 896; *Cmty. Bank of Homewood–Flossmoor v. Bailey (In re Bailey),* 145 B.R. 919, 927 (Bankr.N.D.Ill. 1992). While a transfer to a relative is not in and of itself sufficient to lead a court to find fraud, such a transfer, coupled with other circumstances, can support a finding of fraud. *Id.* "[P]roof of harm is not a required element of a cause of action under Section 727." *Smiley,* 864 F.2d at 569; *see also Snyder,* 152 F.3d at 601; *Krehl,* 86 F.3d at 744 n. 4.

The Court finds that the Creditor has demonstrated an improper intent on the part of the Debtor. Although the Debtor did not admit that his intent was fraudulent, an examination of the facts and circumstances leads the Court to deduce and infer a fraudulent intent on the part of the Debtor. The $90,000.00 transfer went directly to his spouse, Mrs. Self, and admittedly the Debtor had the continued use and benefit of the funds. The purchase of the Cadillac automobile was allegedly a gift for Mrs. Self. Nevertheless, the Debtor testified that he had the continued use and benefit of the vehicle. It was the family car that he drove on a regular basis. Finally, the Debtor failed to prove that the transfer of the $26,803.70 to Mrs. Self actually went to the mortgage holder on

240

the Olympia Fields Property. The Court finds that the Debtor's transfers of this property to his spouse for no consideration, coupled with his continued use and benefit of the transferred property, strongly indicates a fraudulent motive underlying these transfers.

Finally, the Court finds that the doctrine of continuing concealment applies in this matter. The transfer of the $90,000.00 to Mrs. Self took place in January 2001, sixteen months prior to the bankruptcy filing. The $26,803.70 transfer to Mrs. Self and the purchase of the Cadillac for Mrs. Self in May 2000 were approximately two years prior to the Debtor's bankruptcy filing. The Court finds that the Creditor has established that the Debtor retained either control of or an interest in this property. Even though these transfers were beyond the one-year limitations period set forth in § 727(a)(2)(A), the Court finds that the Debtor's concealment of his retained interest in and use of the property continued into the one-year period prior to the bankruptcy filing, and was coupled with the requisite fraudulent intent. Hence, under the doctrine of continuing concealment, the Court denies the Debtor's discharge pursuant to § 727(a)(2)(A).

### B. 11 U.S.C. § 727(a)(3)

Next, the Creditor argues that the Debtor failed to keep or preserve financial records from which his financial condition might be ascertained and has, thus, violated 11 U.S.C. § 727(a)(3). Specifically, the Creditor contends that the Debtor's records fail to show the details of his expenditure of the $252,095.90 balance of the lottery winnings. Section 727(a)(3) bars a debtor's discharge for the failure to keep financial records and provides that:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3) (2005).

"The purpose of §. 727(a)(3) is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *Scott,* 172 F.3d at 969 (internal quotations omitted). While this provision was not meant to bar the discharge of the ordinary consumer debtor, *see id.* at 970, a "sudden and large dissipation of assets," coupled with a lack of books and records will provide a basis for denial of a discharge under this section. *PNC Bank, Nat'l Assoc. v. Buzzelli (In re Buzzelli),* 246 B.R. 75, 98 (Bankr.W.D.Pa. 2000).

"Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" *Juzwiak,* 89 F.3d at 427 (*quoting Bay State Milling Co. v. Martin (In re Martin),* 141 B.R. 986, 995 (Bankr. N.D.Ill.1992)); *see also Union Planters Bank, N.A. v. Connors,* 283 F.3d 896, 899 (7th Cir.2002). This statute "ensures that trustees and creditors will receive sufficient information to enable them to 'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.'" *Juzwiak,* 89 F.3d at 427–28 (*quoting Martin,* 141 B.R. at 995).

"Section 727(a)(3) does not require proof of criminal or quasi-criminal conduct; rather, a transfer or removal of assets, a destruction or other wasting of assets, or a concealment of assets is all the trustee must prove." *Scott,* 172 F.3d at 969. Intent is not an element of proof under § 727(a)(3). *Connors,* 283 F.3d at 901; *Scott,* 172 F.3d at 969; *Juzwiak,* 89 F.3d at 430.

The statute places an affirmative duty on the debtor to create books and records accurately documenting his financial affairs. *Juzwiak,* 89 F.3d at 429 ("The debtor has the duty to maintain and retain comprehensible records."). Especially pertinent in this matter, the creditors are not required to accept a debtor's oral recitations or recollections of his transactions; rather, to qualify for a discharge in bankruptcy, a debtor is required to keep and produce written documentation of all such transactions. *See id.* at 429–30. The text of § 727(a)(3) does not merely require that the debtor not lose any records; it mandates a denial of discharge for the "failure to act," unless such failure to act is justifiable. *Scott,* 172 F.3d at 969; *John Deere Co. v. Broholm (In re Broholm),* 310 B.R. 864, 879 (Bankr.N.D.Ill.2004); *Costello,* 299 B.R. at 897.

A creditor has the initial burden of proving that the debtor failed to keep adequate records. *Costello,* 299 B.R. at 897; *Martin,* 141 B.R. at 995; *Calisoff v. Calisoff (In re Calisoff),* 92 B.R. 346, 356 (Bankr.N.D.Ill.1988). "Records are not 'adequate' if they do not provide the trustee or creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Martin,* 141 B.R. at 995. Every debtor has a duty to take reasonable precautions to maintain and preserve records of their fi-

nancial transactions and affairs. *Brandt v. Carlson (In re Carlson),* 231 B.R. 640, 654 (Bankr.N.D.Ill.1999), *aff'd,* 250 B.R. 366 (N.D.Ill.2000), *aff'd,* 263 F.3d 748 (7th Cir. 2001).

The completeness and accuracy of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's financial situation. *Bailey,* 145 B.R. at 924. Courts should consider the sophistication of the debtor, his educational background, his business experience and acumen, and his personal financial structure. *Costello,* 299 B.R. at 897; *Calisoff,* 92 B.R. at 356. Neither the court nor the creditors are required to reconstruct a debtor's financial picture by "sifting through a morass of checks and bank statements." *Connors,* 283 F.3d at 899. Rather, it is the debtor's duty to maintain and provide the court and the creditors with organized records of his financial affairs. *Id.; Juzwiak,* 89 F.3d at 429. Courts have broad discretion in deciding whether the books and records of a debtor are sufficient under § 727(a)(3). *Costello,* 299 B.R. at 897.

Section 727(a)(3) does not specify a time period for which a debtor is required to account for his pre-petition financial condition. Several courts, however, have limited the inquiry to a period of two years prior to the commencement of the case, absent evidence of earlier fraudulent transfers or other avoidable dissipation of assets. *See Buzzelli,* 246 B.R. at 96; *Losinski v. Losinski (In re Losinski),* 80 B.R. 464, 472–74 (Bankr.D.Minn.1987).

The Court holds that a debtor should be made to account for his business and personal transactions for a reasonable period prior to the commencement of the bankruptcy filing. The determination of what constitutes a reasonable period prior to the filing must be measured on a case-

by-case basis, taking into account all of the circumstances of the case. In the case at bar, the Court holds that the Debtor was required to maintain pre-petition financial records from April 2000, the time he received the remainder of the lottery prize.

Once the party alleging a violation under § 727(a)(3) has demonstrated that the debtor's records are inadequate, the burden of production shifts to the debtor to justify the lack of adequate records. *Costello*, 299 B.R. at 897; *Bailey*, 145 B.R. at 924.

The Creditor contends that the Debtor has failed to keep recorded information regarding his disposition of the $252,095.90 lump sum he received from the Illinois State Lottery. In particular, the Creditor argues that the Debtor does not have financial records to show the dissipation of these funds to family members as gifts, for college tuition payments, and for mortgage payments on the Olympia Fields Property.

The Court begins by summarizing the records that the Debtor produced. First, the Debtor provided a select few bank statements from his joint checking account at Pullman Bank. *See* Debtor Ex. Nos. 7–14. In particular, the Debtor produced his checking account statements for the period April 17, 2000 through July 18, 2000. *See* Debtor Ex. Nos. 7–10. The checking account statement for the period July 19, 2000 through August 15, 2000 was not produced. The Debtor provided the account statements for the period September 18, 2000 through November 15, 2000. *See* Debtor Ex. Nos. 11–13. The checking account statements for the period November 16, 2000 through April 15, 2001 were not provided. In sum, the Debtor produced only seven monthly bank statements from calendar year 2000. Finally, the Debtor produced only one page of bank statements for calendar year 2001. *See* Debtor

Ex. No. 14. Specifically, he provided a single page from the three-page April 16, 2001 checking account statement. *Id.* No other records were produced for the year 2001.

The Debtor testified at trial and at his deposition taken in connection with this matter on July 2, 2003, that many of his financial documents were packed away in boxes in a basement and that some of the documents had been destroyed. *See* Creditor Ex. No. 8, at pp. 95–105. The bank statements that were provided do not indicate the recipients of the money or the nature of the expenditures. Most significantly, the Debtor failed to produce any deposit slips and provided only a few cancelled checks that correspond with the withdrawals from the checking account.

Next, the Court must determine whether these records are adequate. The bank statements and cancelled checks that the Debtor provided show that on April 27, 2000, the Debtor deposited $252,095.90 into the joint checking account. *See* Debtor Ex. No. 8, at p. 2. Thereafter, on May 9, 2000 a check was written in the amount of $26,803.70. *Id.;* Creditor Ex. No. 4iii. According to the Debtor, Mrs. Self made this check payable to herself for the purpose of purchasing a cashier's check made payable to Ameriquest, the mortgage holder on the Olympia Fields Property. However, the Debtor provided no corroborating documentation to support his explanation of how this money was used. Indeed, he failed to provide a copy of the cashier's check or a statement from the mortgage company to show that it received such payment.

Further, on May 6, 2000, the Debtor wrote a check to Shirley Cadillac in the sum of $46,301.94 for the purchase of a Cadillac automobile. *See* Creditor Ex. No. 4ii; Debtor Ex. No. 8, at p. 3. Both the

Debtor and Mrs. Self testified that the Debtor purchased this vehicle as a gift for Mrs. Self. The Debtor further stated that he was not named on the vehicle's title, but failed to produce that title showing evidence of ownership. As of May 15, 2000, the checking account had an ending balance of $181,873.84. *See* Debtor Ex. No. 8, at p. 3.

On June 10, 2000, the Debtor wrote a check in the sum of $6,331.97 for the purchase of the Hyundai automobile. *See* Debtor Ex. No. 9, at p. 2; Creditor Ex. No. 4iv. As of July 18, 2000, the checking account had an ending balance of $156,646.74. *See* Debtor Ex. No. 10, at p. 2. The amount in the checking account kept declining as a result of checks drawn, and, as of November 15, 2000, the Debtor's checking account had an ending balance of $126,154.37. *See* Debtor Ex. No. 13, at p. 3. The one-page April 16, 2001 checking account statement showed that on March 28, 2001, a check written by the Debtor in the sum of $25,000.00 was debited from the account. *See* Debtor Ex. No. 14. The Debtor and Savysky both testified that this $25,000.00 check was for the amount due under the loan for the year 2001. The balance in the account as of April 10, 2001 was $151.95. *Id.*

The Debtor also produced a few cancelled checks from his checking account. *See* Creditor Ex. No. 4. Specifically, the Debtor produced check number 6505 dated January 16, 2001, made payable to Tommie L. Self and signed by Tommie L. Self in

the sum of $90,000.00. *See* Creditor Ex. No. 4i. Both the Debtor and Mrs. Self testified that the check was made payable to Mrs. Self and signed by the Debtor. The Debtor also supplied check number 6288 which was made on May 6, 2000 to Shirley Cadillac in the sum of $46,301.94 for the purchase of the Cadillac. *See* Creditor Ex. No. 4ii. The Debtor also produced check number 6291 dated May 9, 2000, made payable to Tommie L. Self in the amount of $26,803.70.[3] *See* Creditor Ex. No. 4iii. Finally, a check made payable to Terry's Automotive Group on June 10, 2000, in the sum of $6,331.97, was produced showing the purchase of the Hyundai automobile. *See* Creditor Ex. No. 4iv.[4]

The Court finds that the Creditor has demonstrated that these bank statements and various cancelled checks do not fully show the Debtor's financial condition and track his financial dealings with substantial completeness and accuracy. The records produced by the Debtor are incomplete and do not provide an accurate picture of his financial situation. Specifically, the records do not show how the Debtor spent most of the approximate $252,000.00 he received in April 2000. The final checking account statement from April 2001 shows approximately $150.00 remaining in the account. *See* Debtor Ex. No. 14. In sum, the Debtor deposited $252,000.00 into his checking account in April 2000. One year later, almost all of that money was gone.

---

3. As previously indicated, this check was made payable to Mrs. Self for the purchase of a cashier's check in order to pay the mortgage arrearage.

4. Photocopies of several other checks were included in the Creditor's exhibit number four, but those pages are difficult, at best, to decipher. Moreover, the Creditor failed to proffer any testimony to show the relevance of those documents. As the Seventh Circuit

Court of Appeals has stated, " '[j]udges are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir.2002), *cert. denied*, 539 U.S. 941, 123 S.Ct. 2606, 156 L.Ed.2d 626 (2003) (*quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). It is not the function of the Court to sift through the evidence and determine the significance of those other documents.

The records provided by the Debtor do not adequately show how the majority of that sum was spent.

■ A debtor has an obligation to reveal, rather than conceal, his complete financial condition. The court should not be required to speculate as to the financial history or condition of the debtor, nor should the court be compelled to reconstruct the debtor's affairs. *Juzwiak*, 89 F.3d at 428. Moreover, the burden is not on the creditor to reconstruct the debtor's financial affairs. *Id.* at 429. As the Seventh Circuit has explained, a creditor "should not be forced to undertake an independent investigation of a debtor's affairs; rather they have a right to be supplied with dependable information on which they can rely in tracing a debtor's financial history." *Id.* (internal quotation omitted); *see also Connors*, 283 F.3d at 899. The Bankruptcy Code does not require a debtor seeking a discharge to maintain a bank account, nor does it require an impeccable system of record keeping. *Buzzelli*, 246 B.R. at 96. Nevertheless, the records must sufficiently identify the transactions so that an intelligent inquiry can be made of those transactions. *Id.* In sum, the Court finds that the Creditor has demonstrated that the records provided by the Debtor are wholly inadequate to allow the Creditor and the Court to ascertain the Debtor's financial condition

■ Next, the Court must determine whether the Debtor has demonstrated that his failure to keep recorded financial information was justified under all of the circumstances of the case. The Debtor testified that the financial records were packed away in boxes and he could not locate them. *See* Creditor Ex. No. 8, at pp. 95–105. He also testified that he may have disposed of some of the records. *Id.* The Debtor stated that he produced all of the bank statements that he was able to find.

*Id.* The Debtor maintained that when he and his family moved, many of the records were packed away in boxes, thrown away, damaged in a flooded basement, or shredded in a document shredder. *Id.* The Court finds that this explanation utterly fails and does not constitute an appropriate justification for the failure to keep adequate records to show what happened to all of the $252,000.00 discounted lottery winnings. Hence, the Debtor failed to offer an explanation to justify the lack of adequate records.

■ The Debtor argues that although he produced only a few of his financial records, the Creditor had the ability to obtain these documents via subpoena to the various financial institutions as well as to the mortgage holder. In other words, the Debtor contends that because the Creditor had the opportunity to request and obtain these records from these entities, the burden to produce the Debtor's financial records ultimately lies with the Creditor. The Court finds this argument disingenuous and unsupported by the case law. The Creditor met its burden of proof by demonstrating that the Debtor failed to keep adequate financial records. The burden then shifted to the Debtor to justify the lack of adequate records. The Creditor is not required to produce the Debtor's financial records; rather, the Debtor must produce those records. Indeed, the Seventh Circuit has stated that the relevant evidence "is far more likely to lie in the hands of a debtor than of the creditor." *Martin*, 698 F.2d at 888.

Consequently, the Court finds that the Debtor has violated § 727(a)(3). Thus, the Court grants judgment in favor of the Creditor. The Debtor's discharge is denied under § 727(a)(3).

### C. 11 U.S.C. § 727(a)(4)(A)

Next, the Creditor contends that the Debtor violated 11 U.S.C. § 727(a)(4) be-

cause he failed to disclose significant assets and certain transfers on his Schedules and Statement of Financial Affairs. In addition, the Creditor argues that the Debtor made false statements at the § 341 creditors' meeting and in his answers to interrogatories propounded by the Creditor. Section 727(a)(4) bars a debtor's discharge if he knowingly and fraudulently makes a false oath in connection with the case. Specifically, § 727(a)(4) provides that:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A) (2005).

▬▬▬▬ The purpose of § 727(a)(4) is to enforce a debtor's duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate. *Costello*, 299 B.R. at 899; *Bostrom*, 286 B.R. at 359; *Carlson*, 231 B.R. at 655; *Bensenville Cmty. Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157, 163 (Bankr.N.D.Ill.1992). The trustee and the creditors have a right to information that will allow them to evaluate the case and administer the estate's property. *Bostrom*, 286 B.R. at 359. Thus, "[c]omplete financial disclosure is a condition precedent to the privilege of discharge." *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 359 (Bankr. N.D.Ill.2001); *see also Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 93 (Bankr.N.D.Ill. 2002).

▬▬▬▬ In order to prevail, a creditor must establish five elements under § 727(a)(4)(A): (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *Olbur*, 314 B.R. at 745; *Costello*, 299 B.R. at 899; *Urological Group, Ltd. v. Petersen (In re Petersen)*, 296 B.R. 766, 790 (Bankr.C.D.Ill.2003); *Fosco*, 289 B.R. at 93; *Bostrom*, 286 B.R. at 359; *Bailey*, 147 B.R. at 162.

▬▬▬▬ Turning to the matter at bar, the Creditor first must establish that the Debtor made a statement under oath. A debtor's petition, schedules, statement of financial affairs, statements made at a § 341 meeting, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of § 727(a)(4). *Broholm*, 310 B.R. at 880; *Costello*, 299 B.R. at 899; *Bostrom*, 286 B.R. at 360; *In re Korte*, 262 B.R. 464, 474 (8th Cir. BAP 2001). Thus, the Court finds that the Debtor's Schedules, Statement of Financial Affairs, his testimony given at the § 341 meeting, and his answers to interrogatories constitute statements made under oath. Hence, there is no dispute that this element has been met.

▬▬▬▬ Second, the Creditor must show that the statements made by the Debtor were false. Whether a debtor made a false oath within the meaning of § 727(a)(4)(A) is a question of fact. *Costello*, 299 B.R. at 899; *Holstein*, 272 B.R. at 477. A false oath may include a knowing and fraudulent omission. *Rafool v. Wilson (In re Wilson)*, 290 B.R. 333, 337 (Bankr.C.D.Ill.2002); *Britton Motor Serv., Inc. v. Krich (In re Krich)*, 97 B.R. 919, 923 (Bankr.N.D.Ill.1988) ("Filing of false schedules with material omissions or misrepresentations with an intent to mislead creditors and the trustee as to a debtor's actual financial condition constitutes a false oath under section 727(a)(4)(A)."). It is a debtor's role to carefully consider the

questions posed and answer them accurately and completely. *Armstrong v. Lunday (In re Lunday)*, 100 B.R. 502, 508 (Bankr.D.N.D.1989).

The Court finds that the Schedules, Statement of Financial Affairs, statements made at the § 341 meeting, and the answers to interrogatories all contain false statements. Specifically, the Debtor failed to list the Cadillac and Hyundai automobiles on his Schedule B. *See* Debtor Ex. No. 1; Creditor Ex. No. 1. The Debtor testified that he purchased the Cadillac as a gift for Mrs. Self in May 2000. Mrs. Self corroborated this testimony. Nevertheless, the Court finds their testimony self-serving and unsupported by any documentary evidence, namely, the title to the vehicle. As for the Hyundai automobile, the Debtor testified that he listed a Honda Accent, but that he never owned such a vehicle. The Debtor explained that the Schedule B mistakenly reflected a Honda Accent, instead of a Hyundai Accent. The Court questions why the Debtor never filed an amendment to his Schedule B to reflect the correct make and model of the vehicle.

 Further, the Debtor failed to list the Chicago Property on his Schedule

A. *Id.* The Debtor testified that he did not think that he was required to list the property because a judicial deed of sale had been entered. *See* Creditor Ex. No. 6. Unfortunately for the Debtor, this excuse has been rejected by the Seventh Circuit, which opined that "[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *In re Yonikus*, 974 F.2d 901, 904 (7th Cir.1992) (revocation of discharge action under 11 U.S.C. § 727(d)(2)). Thus, when a debtor is in doubt concerning disclosure, it is clear that the debtor is obligated to disclose. *See Richardson v. Von Behren (In re Von Behren)*, 314 B.R. 169, 179 (Bankr.C.D.Ill. 2004). Here, the Debtor should have erred on the side of disclosing the Chicago Property, rather than making a determination on his own that he no longer owned it. "Debtors have the ultimate responsibility for the accuracy of the information contained in their schedules, which cannot be avoided by playing ostrich." *Wilson*, 290 B.R. at 340.

Moreover, the Debtor's Statement of Financial Affairs contains a false statement.[5]

5. The Creditor argues that the Debtor made additional false statements in the Statement of Financial Affairs. First, the Creditor maintains that in his answer to question ten, the Debtor failed to disclose the $90,000.00 transfer he made to Mrs. Self in January 2001. Question ten asked the Debtor to list all property transferred within one year preceding the commencement of the case. *See* Debtor Ex. No. 1; Creditor Ex. No. 1. The Debtor's bankruptcy case was filed in May 2002 and the transfer to Mrs. Self was made in January 2001, more than one year prior to the filing of the bankruptcy case. While the Court has held that the failure to disclose this transfer constitutes a continuing concealment in violation of § 727(a)(2)(A), the Court finds that the continuing concealment doctrine does not apply to § 727(a)(4) when it applies to the answers for the Statement of Financial Affairs.

Thus, the Debtor was not required to list this transfer, which took place more than one year prior to the filing of the case. Accordingly, when the Debtor checked the box that indicated "none," he did not make a false statement under oath for purposes of § 727(a)(4).

Next, the Creditor maintains that the Debtor falsely answered question two in the Statement of Financial Affairs, which asked him to list all income, other than from employment, during the two years preceding the May 15, 2002 filing date. *Id.* The Creditor alleges that when the Debtor checked the box that indicated "none," in response to this question, he failed to disclose the $252,095.90 he received from the Illinois State Lottery. The Court finds that the Debtor's response to this question was not false because he received the

*See* Debtor Ex. No. 1; Creditor Ex. No. 1. In particular, question seven asked the Debtor to disclose any gifts made to family members in excess of $200.00 within one year preceding the filing. *Id.* The Debtor checked the box that indicated "none." *Id.* However, the Debtor testified that he made several gifts to family members, including his mother, mother-in-law and sisters in excess of $200.00 each. *See* Creditor Ex. No. 8, at pp. 93–95. The Debtor testified that he made several gifts, some over $500.00 per family member, in the summer of 2001. *Id.* The Debtor was unable to recall the exact amounts of the gifts or the precise time those gifts were made. *Id.* Thus, the Court finds his answer to question seven was false.

Further, the Court finds that the Debtor made false statements at the § 341 meeting of creditors. First, the Debtor was asked whether he had purchased any vehicles with the proceeds from the lottery prize. *See* Creditor Ex. No. 9, at p. 26. He answered "no." *Id.* The Court finds this statement false because the Debtor admitted at trial that he purchased a Cadillac and a Hyundai with the lottery prize money.

Second, the Creditor contends that the Debtor made a false statement when he failed to disclose the $90,000.00 transfer to Mrs. Self. One of the questions propounded to the Debtor was whether he transferred any of the prize money within the ninety days preceding the case filing. *Id.* at p. 22. The Debtor answered that all of the money was gone by that time. *Id.* As previously stated, the transfer to Mrs. Self was more than one year prior to the bankruptcy filing. Hence, the Court finds that the Debtor's failure to disclose this transfer at the § 341 meeting in answer to this question was not false. However, when questioned generally about what happened

to the prize money, the Debtor did not disclose that he transferred $90,000.00 of it to Mrs. Self. *Id.* at pp. 18–22. The Court finds that the Debtor's failure to disclose the transfer in response to this question was a false statement by omission.

In addition, the Court finds that the Debtor made a false statement in his answers to interrogatories. In particular, the Debtor failed to disclose the $90,000.00 transfer in his answer to interrogatory number five. That interrogatory asked him to identify every payment or disbursement to anyone in the amount of $1,000.00 or more from April 2000 to the present. *See* Creditor Ex. No. 15, at p. 4. He answered this interrogatory by stating that "[the Debtor] does not recall any disbursement to a person of more than $1,000.00. If a disbursement was made, it would have been by check and all checks in possession of [the Debtor] had [sic] been produced and tendered to attorneys for [the Creditor]." *Id.* The $90,000.00 transfer to Mrs. Self was made on January 16, 2001, clearly within that time frame. *See* Creditor Ex. No. 4i. Accordingly, the Debtor's answer was false.

In summary, the Court finds that the Debtor made false statements and omissions in the Schedules, the Statement of Financial Affairs, the answers to interrogatories, and in his testimony given at the § 341 meeting. Thus, the Creditor has established this element.

■ Third, the Creditor must establish that the false statements and omissions were knowingly made. The Debtor, although not an experienced and articulate business person, knew or should have known that the testimony given at the § 341 meeting, the answers to interrogatories, the Schedules, and Statement of Fi-

lump sum payment in April 2000, just beyond the two years preceding the bankruptcy filing.

nancial Affairs were incomplete and inaccurate as previously discussed. The mere fact that a debtor may not be highly educated does not serve as an excuse for his failure to disclose. The Debtor failed to satisfactorily explain his misstatements and omissions. Hence, the Court finds that this element has been satisfied.

 Fourth, the Creditor must prove that the Debtor made the false statements with fraudulent intent. "Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998). To find the requisite degree of fraudulent intent, a court must find that the debtor knowingly intended to defraud or engaged in behavior that displayed a reckless disregard for the truth. *Yonikus*, 974 F.2d at 905; *Bailey*, 147 B.R. at 164–65 (*citing Yonikus*). As with § 727(a)(2)(A), direct evidence of intent to defraud may not be available. *Costello*, 299 B.R. at 900. Thus, the requisite intent under § 727(a)(4)(A) may be inferred from circumstantial evidence or by inference based on a course of conduct. *See Yonikus*, 974 F.2d at 905; *Carlson*, 231 B.R. at 655; *Costello*, 299 B.R. at 900. Reckless disregard means "not caring whether some representation is true or false...." *Chavin*, 150 F.3d at 728. If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the plaintiff seeking denial of the discharge need not offer any further evidence of fraud. *Costello*, 299 B.R. at 900; *Calisoff*, 92 B.R. at 355.

The Court readily infers the requisite fraudulent intent from the totality of the evidence. The testimonial and documentary evidence clearly shows that the Debtor knew of the existence of the Chicago Property, the automobiles, the $90,000.00 trans-

fer to Mrs. Self, and the gifts made to family members, but failed to disclose them at the § 341 meeting or in his answers to interrogatories, and failed to include these assets and transfers on his Schedules and Statement of Financial Affairs. At the very least, the Debtor demonstrated a reckless disregard of or indifference to the truth of his situation. *See Croge v. Katz (In re Katz)*, 203 B.R. 227, 235 (Bankr.E.D.Pa.1996) (noting that the existence of more than one falsehood, plus the failure to clear up all inconsistencies when filing amendments may constitute a reckless disregard and be sufficient for denial of discharge). The misstatements and omissions here were not insignificant. The errors and omissions in the Schedules, Statement of Financial Affairs, the statements made at the § 341 meeting, and the answers to interrogatories, when viewed collectively for their cumulative effect, suggest fraudulent intent on the part of the Debtor.

 While the Court does not expect every individual item of clothing or piece of furniture to be scheduled and valued, or that each scheduled liability be listed with absolute arithmetic precision, there comes a point when the aggregate errors and omissions cross the line past which a debtor's discharge should be denied. *See Bostrom*, 286 B.R. at 364 (finding that the debtors' failure to disclose three parcels of real property in Florida, a fur coat, three television sets, a stereo system, and substantial income constituted grounds for denial of their discharge); *A.V. Reilly Int'l, Ltd. v. Rosenzweig (In re Rosenzweig)*, 237 B.R. 453, 457 (Bankr.N.D.Ill.1999) (finding that the debtor's failure to disclose an income tax refund and a second computer constituted grounds for denial of his discharge); *Netherton v. Baker (In re Baker)*, 205 B.R. 125, 133 (Bankr.N.D.Ill. 1997) (finding that the debtor's failure to

disclose his tropical fish hobby and its assets, including over 100 fish tanks, constituted grounds for denial of his discharge). Wherever that fine and elusive line is, the Court is of the view it has been crossed here. The Court can understand that occasionally there may be an innocently omitted de minimus asset, but here the failure to disclose the Chicago Property, two automobiles, the $90,000.00 transfer to Mrs. Self, and the large gifts to family members is simply too substantial to overlook or attribute to mere negligence or inadvertence on the part of the Debtor.[6]

Finally, the Creditor must show that the statements related materially to the bankruptcy case. A debtor's false oath must relate to a material matter before it will bar a discharge in bankruptcy. *In re Agnew,* 818 F.2d 1284, 1290 (7th Cir.1987). "[T]he test for materiality of the subject matter of a false oath is whether it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Bailey,* 147 B.R. at 162 (*quoting In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984)); *see also Wilson,* 290 B.R.

at 337; *Holstein,* 272 B.R. at 477. A false oath may be material even though it does not result in any detriment or prejudice to the creditor. *Von Behren,* 314 B.R. at 180. Certainly, the Debtor's failure to disclose the Chicago Property, two automobiles, gifts to family members, and the transfer of $90,000.00 to Mrs. Self bears a relationship to the bankruptcy estate and concerns the discovery of assets and the disposition of property. Hence, the Court finds that the above discussed misstatements and omissions are material to the bankruptcy case, and therefore, the Creditor has satisfied this element.

After considering the totality of the evidence, the Court finds that the Creditor has shown by a preponderance of the evidence each element under § 727(a)(4)(A). Therefore, the Court denies the Debtor's discharge on this ground.

### D. 11 U.S.C. § 727(a)(5)

Finally, the Creditor contends that the Debtor has failed to adequately explain the loss of the $252,095.90 he received from the Illinois State Lottery and has, thus, violated 11 U.S.C. § 727(a)(5). Section 727(a)(5) bars a debtor's discharge

---

6. These are substantial omissions in the Debtor's § 341 meeting testimony, the Schedules, the Statement of Financial Affairs, and the answers to interrogatories that cannot be excused by way of amendment. Subsequent voluntary disclosure through amendment to the schedules or testimony does not expunge the falsity of the oath. *Bailey,* 147 B.R. at 165. "The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); *see also Mazer v. United States,* 298 F.2d 579, 582 (7th Cir.1962) (noting that the offense of false oath and false swearing cannot be avoided by amending the schedule).

Although a debtor cannot necessarily redress a false oath by making a subsequent correction, *Costello,* 299 B.R. at 899–900; *Bailey,* 147 B.R. at 165, the fact that a debtor comes forward with omitted material of his own accord is evidence that there was no fraudulent intent in the omission. *In re Brown,* 108 F.3d 1290, 1295 (10th Cir.1997). Here, however, the Debtor has made no attempt to amend his Schedules, Statement of Financial Affairs, or his answers to interrogatories to correct the discussed glaring misstatements and omissions. That the Debtor did nothing to correct these errors after this adversary proceeding brought them to light demonstrates that full and honest disclosure was not important to this Debtor. *See Olbur,* 314 B.R. at 746.

for the failure to explain any dissipation of assets and provides in pertinent part that:

> (a) The court shall grant the debtor a discharge, unless—
>
>> (5) the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a)(5) (2005). The inquiry under § 727(a)(5) is not limited to events or transactions that have occurred within a specified number of months or years before the bankruptcy filing. *Buzzelli*, 246 B.R. at 117. Thus, while § 727(a)(5) prescribes no limitations period, the assets in question must have belonged to the debtor at a time not remote in time to the commencement of the case. *Olbur*, 314 B.R. at 741. A focus on the two years prior to the bankruptcy filing is common. *See, e.g., Martin*, 698 F.2d at 886; *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 813 (7th Cir. 1966); *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 552 (Bankr.N.D.Ill.2002). Inquiries beyond the two-year period may be warranted. *See, e.g., In re D'Agnese*, 86 F.3d 732, 734 (7th Cir.1996) (expanding the focus to nine years pre-petition). The exact time a court should look back depends on the case; there is no hard and fast rule. *Olbur*, 314 B.R. at 741.

"Section 727(a)(5) is broadly drawn and clearly gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Martin*, 698 F.2d at 886. "By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, section 727(a)(5) is one of several Code provisions meant to relieve creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor." *Olbur*, 314 B.R. at 740 (internal quotation omitted). Courts are not concerned with the wisdom of a debtor's disposition of assets but, instead, focus on the truth, detail, and completeness of the debtor's explanation of the loss. *D'Agnese*, 86 F.3d at 735. A debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation." *Martin*, 698 F.2d at 888.

There are two stages of proof under § 727(a)(5). *Olbur*, 314 B.R. at 740; *Mantra*, 314 B.R. at 730; *Bostrom*, 286 B.R. at 364; *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 955 (Bankr. N.D.Ill.1995). First, the party objecting to discharge has the burden of proving that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors. *Id.* Second, if the party objecting to the discharge meets that burden, then the debtor is obligated to provide a satisfactory explanation for the loss. *Id.*

What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *Baum*, 359 F.2d at 814; *Olson v. Potter (In re Potter)*, 88 B.R. 843, 849 (Bankr.N.D.Ill. 1988) (*citing Baum*). A debtor's explanation "must consist of more than the vague, indefinite, and uncorroborated hodgepodge of financial transactions. . . ." *Baum*, 359 F.2d at 814. "Instead it must be a good faith explanation of what really happened to the assets in question." *Potter*, 88 B.R. at 849. "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets." *Martin*, 141 B.R. at 999. Although the explanation does not necessarily need to be comprehensive, it must meet two criteria in order to be deemed "satisfactory." *Mantra*, 314 B.R. at 730; *Costello*, 299 B.R. at 901; *Bostrom*, 286 B.R. at 364;

*Bryson*, 187 B.R. at 956. First, it must be supported by at least some documentation. *Id.* Second, this documentation must be sufficient to eliminate the need for the court to speculate as to what happened to all the assets. *Id.*

 Even though a satisfactory explanation must be convincing about the lack of concealment, the focus of the inquiry is not exclusively on the subjective nature or honesty of the debtor's explanation, but is also on the objective adequacy of such explanation. *See D'Agnese*, 86 F.3d at 735. Furthermore, a debtor's failure to satisfactorily justify a substantial loss of assets need not be the product of fraudulent intent. *Mantra*, 314 B.R. at 730. An objecting creditor must prevail on two issues, however: the disappearance of substantial assets and the lack of a satisfactory explanation for the disappearance. *Id.; Hermanson*, 273 B.R. at 546.

 The Court finds that the Creditor has met its burden and has shown that the Debtor owned substantial assets that are no longer available for his creditors. Specifically, the Creditor has established that in April 2000, the Debtor received approximately $252,000.00 from the Illinois State Lottery. *See* Debtor Ex. No. 8, at p. 2. About two years later, in May 2002, when the Debtor filed his bankruptcy petition, those funds were no longer available for his creditors. *See* Creditor Ex. No. 9, at pp. 14–22. Hence, the Creditor has shown that the Debtor had a substantial and identifiable sum of money approximately two years prior to the bankruptcy filing that is no longer available for his creditors. Accordingly, the burden now shifts to the Debtor to provide a satisfactory explanation for the loss.

The Court finds that the Debtor has not satisfactorily explained the loss of those funds. The Debtor testified that he spent approximately $46,000.00 to purchase a Cadillac for Mrs. Self and used another $6,000.00 to purchase a Hyundai automobile. *See also* Debtor Ex. No. 8, at p. 3; Debtor Ex. No. 9, at p. 2; Creditor Ex. Nos. 4ii & 4iv. Also, $25,000.00 was given to the Creditor in March 2001. *See* Debtor Ex. No. 14. As for the remainder of the money, the Debtor's explanation as to the dissipation of that sum is vague at best.

He acknowledged that he gave Mrs. Self $90,000.00. *See also* Creditor Ex. No. 4i. He testified that she used that money to make mortgage payments on the Olympia Fields Property, pay college tuition for their children, and pay household expenses. However, the Debtor offered no documentary or other testimonial evidence to corroborate this explanation. Mrs. Self testified that she did not know what happened to the $90,000.00 the Debtor transferred to her. Further, in May 2000, a check was made payable to Mrs. Self for approximately $26,800.00. *See* Creditor Ex. No. 4iii. The Debtor testified that Mrs. Self used this money to purchase a cashier's check for the payment of the mortgage on the Olympia Fields Property. However, the Debtor did not produce any documents to show that a cashier's check was in fact purchased, or that the mortgage lender received the funds.

While the Court does not doubt the credibility of the Debtor's undisputed testimony, standing alone, this self-serving testimony is insufficient because it is not supported by any documentary or other testimonial evidence. Moreover, an explanation is not satisfactory simply because it has been offered in good faith and relates to events that were nonfraudulent in nature. *Hermanson*, 273 B.R. at 552. The explanation must be objectively adequate. *Id.*

The Court finds that the Debtor satisfactorily explained the loss of approximately $77,000.00 ($46,000.00 to purchase a Cadillac, $6,000.00 to purchase a Hyundai, and a $25,000.00 payment to the Creditor). The Debtor has not, however, satisfactorily explained the dissipation of the remaining amount he received from the lottery prize. The Debtor made vague and indefinite statements about the missing funds without any corroborating documentation to support his explanation. His testimony that gifts were made to family members, mortgage payments were made, tuition payments were made, and other bills were paid with the funds is not supported by any documentation. The incomplete bank statements along with a few of the cancelled checks are insufficient to explain the loss and do not eliminate the need for the Court to speculate as to what happened to the money. It is not the role of the Court to sift through the Debtor's partial bank records in an attempt to determine how he spent these funds.

█ The Court does not take issue with the wisdom, or lack thereof, of the Debtor's dissipation of the funds. Rather, the Court is solely concerned with the sufficiency of the Debtor's explanation for the loss of those assets. That explanation in this matter falls far short of what is required. Merely offering a general oral explanation for the disappearance of substantial assets without documentary corroboration is not enough to overcome a § 727(a)(5) objection to discharge. *See D'Agnese*, 86 F.3d at 733–35. Accordingly, the Court finds that the documentary and testimonial evidence offered by the Debtor constitutes a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." *See Baum*, 359 F.2d at 814.

In sum, the Court finds that the Debtor failed to provide a satisfactory explanation for his dissipation of the entire lottery prize. The Debtor's testimony alone, without corroborating evidence, does not constitute a satisfactory explanation for the loss of most of this sum for purposes of § 727(a)(5). Thus, the Court grants judgment in favor of the Creditor. The Debtor's discharge is denied under § 727(a)(5).

**E. Whether the Court should enter a judgment in favor of the Creditor**

█ In the amended complaint, the Creditor asks the Court to enter a judgment in its favor in the sum of $145,776.01, which represents the total unpaid balance, interest, costs and attorney's fees accrued to date by the Debtor as a result of his default under the loan documents. In this adversary proceeding, the Creditor seeks two forms of relief: (1) the denial of the Debtor's discharge, and (2) liquidation of its debt. Some bankruptcy courts have expressed a reluctance to liquidate debts, preferring instead to allow courts of general jurisdiction to undertake that task. *See Michener v. Brady (In re Brady)*, 234 B.R. 652, 663 (Bankr.E.D.Pa.1999), *aff'd*, 243 B.R. 253 (E.D.Pa.2000). However, a creditor may obtain both avenues of relief. *See, e.g., Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *In re Bero*, 110 F.3d 462 (7th Cir.1997).

█ The Court declines to liquidate the Creditor's debt and enter a judgment in favor of the Creditor. The Court is unable to ascertain the exact amount due and owing the Creditor pursuant to the loan agreement. The complaint seeks the sum of $145,776.01, but at trial, Savysky, on behalf of the Creditor, testified that amount due and owing the Creditor is approximately $198,000.00. The Creditor failed to adequately demonstrate at trial how those sums were calculated to establish the proper amount of its debt. As a result, the Court will not liquidate and reduce the Creditor's debt to a money

judgment. The Creditor will have to seek the liquidation and collection of its debt against the Debtor in another forum.

## V. *CONCLUSION*

For the foregoing reasons, the Court grants judgment in favor of the Creditor and sustains the objections to discharge under § 727(a)(2)(A), (a)(3), (a)(4) and (a)(5). The Debtor's discharge is denied. The Court declines to liquidate the Creditor's debt and enter a money judgment in its favor.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.